# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DEBORAH ANN DESUZA,**

    **Plaintiff,**

**v.**                   **Case No:  6:12-cv-21-Orl-22GJK**

**COMMISSIONER OF SOCIAL
SECURITY,**

    **Defendant.**

_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

   Deborah Ann Desuza (the "Claimant"), appeals to the District Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for benefits.  Doc. No. 1.  Claimant maintains that the final decision of the Commissioner should be reversed because the Administrative Law Judge (the "ALJ") erred by failing to: 1) apply the correct legal standards to the opinion evidence; 2) properly apply the pain standard to Claimant's subjective statements; 3) incorporate any non-exertional limitations in his residual functional capacity ("RFC") assessment from Claimant's severe non-exertional impairments; and 4) find Claimant's depression, anxiety, panic disorder, and insomnia are severe impairments and to incorporate limitations therefrom in the RFC.  Doc. No. 19 at 10-21.  Claimant requests that the case be reversed for an award of benefits or remanded to the Commissioner for further proceedings.  Doc. No. 19 at 17, 22. For the reasons set forth below, it is recommended that the final decision be **REVERSED and REMANDED for further proceedings.**

I.  **BACKGROUND.**

Claimant was born on November 19, 1955, and is a high school graduate.  R. 26-27, 88, 98.  On March 8, 2008, Claimant filed an application for disability benefits alleging an onset of disability as of January 21, 2007.  R. 89-99.   Claimant alleges disability due to fibromyalgia, herniated discs in the lumbar and cervical spine, migraine headaches, depression, anxiety, and pain. R. 29, 55, 59.  Claimant's past employment experience includes working as a dental receptionist, gift shop owner, office manager, and as a housekeeper/maid.  R. 25, 120.

II.  **MEDICAL AND OPINION EVIDENCE.**

The record contains: treatment records from six primary treating physicians - Drs. Tessler, Gillespy, Bhalani, Hull, Bonnet, and Ortolani; three opinions from two long-standing treating physicians, Drs. Ortolani and Bonnet,  opining that Claimant is not capable of working; treatment notes from three other treating physicians, Drs. Hull, Tessler, and Gillespy, who opine that Claimant has diagnoses and limitations that are consistent with the opinions of Drs. Ortolani and Bonnet; two consulting opinions from state agency examiners, including an opinion from Dr. Barber, who makes findings that are favorable and unfavorable to Claimant's allegations and offers a vague opinion as to Claimant's ultimate limitations; and four opinions from non-examining physicians who reviewed records.

**A.  Dr. Tessler – September 16, 2005 – February 2, 2007.**

Claimant received treatment from Dr. Richard H. Tessler on three occasions from September 16, 2005 through February 2, 2007.  R. 198-205.  On September 16, 2005, Claimant presented complaining of pain in the base of her left thumb, which had persisted for two and a half years, but was now interfering with her function.  R. 204.  Claimant is right handed.  R. 204. Dr. Tessler's notes show that Claimant was being treated by Dr. Mark Gillespy, who had been

providing Claimant with injections for her discomfort.  R. 204.  Physical examination showed full range of motion in the left wrist, tenderness at the base of the left thumb, positive Grind's test, and some instability in the joints of the left thumb.  R. 205.[1]  After reviewing x-rays from March of 2005, Dr. Tessler assessed significant degenerative arthritis of the first carpometacarpal joint.  R. 205.  Dr. Tessler recommended a trapezial excision.  R. 205.

On April 21, 2006, Claimant stated that the pain is getting worse and requested surgery. R. 202.  Physical examination revealed a good range of motion in the basal joint of the left thumb, and a negative Grind's test.  R. 202.  Dr. Tessler stated that he was not sure surgery was appropriate and injected the thumb with Xylocaine.  R. 202.

On February 2, 2007, Claimant presented complaining of pain and reporting that she received several injections in her thumb since last seeing Dr. Tessler.  R. 198.  Physical examination revealed "sharp pain."  R. 198.  Claimant had no numbness or tingling, but "pulling charts and using her thumb to pick things up especially bothers her."  R. 198.  Claimant had no problems moving her fingers or wrist.  R. 198.  X-rays showed "some degenerative arthritis," which Dr. Tessler opined is "moderate in severity."  R. 199.  Dr. Tessler stated that Claimant is "not a great surgical candidate right now," due to her current level of pain medications and frequency of steroid injections.  R. 199-200.

On that same day, Dr. Tessler wrote a letter to Claimant's primary care physician, Dr. James Hull stating:

> She has a moderate amount of degenerative arthritis at the basal joint of her left thumb.  What worries me is her chronic pain problems which are allowing her to take Percocet 10 mg four times a day, the fact she is on Prednisone 10 mg a day, she has a hernia

---

[1] A "Grind's test" is "performed by holding thumb proximal phalax & MCP [Joint] in examiner's hands & forcefully pushing against trapeziometacarpal joint, while also rotating it slightly, to cause grinding motion." Clifford R. Wheeless, III, M.D., *Wheeless' Textbook of Orthopaedics*, Duke University Medical Center's Division of Orthopaedic Surgery, http://www.wheelessonline.com/ortho/finkelsteins_test_and_the_grind_test.

> that needs to be repaired and the fact that she is going to undergo steroid epidurals. The patient has enough problems going on that doing a trapezial excision and suspensionplasty at this time I don't think is in her best interest. . . . The other thing she would have to do if she wants the operation is she will not be able to do a job that requires pinching with her hand, taking charts off of shelves and putting them back all day. I will see her after her steroid epidurals and after tapering her Prednisone if possible. Maybe she should have the hernia repair done and when everything is nice and cleared up I will go ahead and consider the operation. This is an operation that requires a lot of rehab. She wants an injection in the base of her thumb. You gave her one two weeks ago. This is too soon for another, but I will be glad to see her in a month and would be happy to inject it at that time. I am prescribing a C-splint for her. That might help.

R. 201. Thus, due to Claimant's current medications and hernia, which needed to be repaired, Dr. Tessler declined to perform surgery on the left thumb at that time. R. 201. There are no other treatment notes from Dr. Tessler in the record

**B. Dr. Gillespy – March 5, 2007.**

Although from Dr. Tessler's records it appears that Claimant has received ongoing treatment in the past from Dr. Mark C. Gillespy (*see* R. 204), the record contains only one treatment note from Dr. Gillespy. R. 206. On March 5, 2007, Claimant presented complaining of "quite a bit of pain in her left thumb region." R. 206. Claimant reported that she was "on medical leave . . . because of fibromyalgia and other conditions." R. 206. Physical examination of the left hand revealed crepitus with range of motion, positive Grind's test, and tenderness over the first metacarpocarpal joint. R. 206. Dr. Gillespy injected Claimant with 3 mg of Celestone and recommended that she see Dr. Tessler if surgery was anticipated. R. 206.

**C. Dr. Kirit Bhalani – February 9, 2007 – May 4, 2007.**

Dr. Bhalani is an advanced pain management specialist, who Claimant saw seven (7) times from February 9, 2007 through May 4, 2007, for persistent pain radiating from her left groin to the left leg. R. 214-24. Claimant reported that the pain gets worse when standing,

leaning forward, and/or walking.  R. 223.  On February 9, 2007, Dr. Bhalani diagnosed Claimant with chronic low back pain, left buttock pain, left groin pain, left upper thigh pain, rule out L1-L2 radiculopathy, and rule out lateral cutaneous femoral neuralgia.  R. 223.  Dr. Bhalani provided a fluoroscopy-guided lumbar epidural steroid injection at the left L1-L2.  R. 223.

On February 16, 2007, Claimant reported 20% to 30% relief, but stated that the pain persists.  R. 221.  Dr. Bhalani performed a left lateral cutaneous femoral nerve block.  R. 221. After the procedure, Claimant was limping due to pain and discomfort, and Dr. Bhalani stated that he was not sure whether she obtained any relief from the procedure.  R. 221.  On February 27, 2007, Claimant reported that the pain was 50% better.  Dr. Bhalani performed another nerve block injection.  R. 218. On March 2, 2007, Claimant reported feeling 70% better, and Dr. Bhalani performed another never bock injection.  R. 216.  On April 2, 2007, Claimant stated that the pain had completely returned.  R. 215.  Dr. Bhalani performed a further nerve block injection.  R. 215.  Dr. Bhalani's notes also state that Claimant was scheduled for a hysterectomy and inguinal hernia repair the following week.  R. 215.

On April 11, 2007, Claimant underwent a hysterectomy and inguinal hernia repair at Halifax Community Health Systems after complaints of chronic pelvic pain.  R. 208-212.  On May 4, 2007, Dr. Bhalani's notes state that he has diagnosed Claimant with lateral cutaneous femoral neuralgia, but he has "tried everything . . . to see if we can give some assistance."  R. 214.  However, the four nerve blocks "did not have any help."  R. 214.  Dr. Bhalani prescribed neuroleptic medication, Lyrica, and recommended that she obtain an MRI.  R. 214.  There are no further treatment records from Dr. Bhalani.

**D.  Dr. James Hull – December 30, 2005 – January 28, 2009.**

Dr. Hull is Claimant's long-term primary care physician.  R. 229-42, 244-61, 300, 400-09.[2]  The record shows that Claimant received treatment on twenty-nine (29) times from Dr. Hull between December 30, 2005 and January 28, 2009.   R. 229-42, 244-61, 300, 400-09.   From December 30, 2005 through January 21, 2007, the Claimant's alleged onset of disability date, Dr. Hull's treatment records reflect the following diagnoses: depression; anxiety; fibromyalgia; failed lumbar disc syndrome with neuropathy and radiculopathy; acute and cluster cephalgia; irritable bowel syndrome; polyarthralgias with pain in her joints; menopausal changes; acute myospasms of the thoracic and lumbar spine with left sided radiculopathy; insomnia; chronic pain; failure to thrive syndrome; and acute pain in the left wrist.  R. 245-61. During the above-referenced time period, Dr. Hull stated that Claimant: suffers from "intractable pain;" has "no fatty tissue on her," weighing 109 pounds; "has a lot of pain with trigger point areas at L4-L5 on the left;" has muscle spasms; has negative straight leg raising tests; normal deep tendon reflexes; has problems with her pain medications; should see a psychologist; may need to take a leave of absence from her job in order to do things at her own pace and to calm herself down; has excruciating and intractable pain in the left wrist; and has "severe anxiety and depression."   R. 245, 252-56, 260.   Dr. Hull prescribed the following medications during the above-referenced time period: Zoloft; Esgic Plus; Xanax; Soma; Decardron and Xylocaine shots; Percocet; Duragesic patches; Effexor, a lumbar support, Ambien, Cymbalta, Acadian, and Prednisone  R. 245-52, 254-59, 261.   Dr. Hull referred Claimant to Dr. Tessler regarding her wrist pain and suggested she see a psychologist for her depression and a neurologist for her back ailments.  R.

---

[2] Dr. Hull is part of the same practice as Dr. Bonnet, Claimant's other long-term treating physician. *See generally* R. 243, 261.

246, 252.   X-rays of the spine during the above-referenced time period showed "minimal retrolisthesis of the L2 on the L3.  R. 254, 263.

From January 21, 2007 through January 28, 2009, Dr. Hull treated Claimant on twelve (12) separate occasions.  R. 229-44, 300, 400-09.  On February 9, 2007, Dr. Hull's notes show that Claimant was being followed by Dr. Tessler for her left wrist and thumb ailments and was also being treated for a right inguinal hernia by another specialist.  R. 244.  During the above-referenced time period, Dr. Hull diagnosed Claimant with the following: osteoarthritis; degenerative changes in the lumbar spine with disc syndrome and radiculopathy; failed lumbar disc syndrome with radiculopathy; severe anxiety and depression; panic attacks; insomnia; hormonal imbalance; migraine cephalgia and cluster cephalgia; rheumatoid arthritis; chronic pain; fibromyalgia; and cervical disc syndrome R. 230, 232, 237, 239, 241, 244, 300, 400, 403, 407.

On April 17, 2007, Dr. Hull's treatment note reflects that Claimant can tandem heel and toe walk with difficulty; her flexion in standing is about 65 degrees; her grip strength is 2/4, both right and left; fine and gross dexterity are present; she is unable to squat, crawl, or work overhead; and she avoids pushing.  R. 241.   Dr. Hull's notes routinely state that Claimant is in chronic pain and has severe anxiety and depression.  R. 230, 235, 237, 241, 300, 400, 407.  On October 8, 2008, Dr. Hull stated that Claimant's "[o]steoarthritis, fibromyalgia, cervical and lumbar disc syndrome, anxiety with depression" are "all chronic and ongoing."  R. 407.  On January 28, 2009, Dr. Hull's notes state: "[Claimant] has all kinds of problems with her spine and osteoarthritis.  She has pain in her neck and thorax and lumbar spine with chronic ongoing pain.  She has seen several specialists, but no one has felt that she would benefit from surgical

intervention at this time." R. 400. On November 7, 2008, Dr. Hull stated that Claimant "really needs to be with a psychiatrist." R. 405.[3]

**E. Dr. John Ortolani – December 27, 2007 – April 20, 2009.**

Claimant received treatment from Dr. Ortolani, a neurologist, on fourteen (14) occasions between December 27, 2007 and April 20, 2009. R. 278-87, 342-46, 375-80. On December 27, 2007, Claimant presented to Dr. Ortolani after being involved in a slip and fall accident on December 15, 2007. R. 283. Physical examination revealed paracervical and paralumbar muscle tenderness and spasms with pain radiating into the left shoulder and numbness in the left arm. R. 283. Physical examination also showed pain radiating into the left hip. R. 283. Motor strength was equal in all extremities. R. 283. Dr. Ortolani assessed posttraumatic headaches, cervical strain syndrome, lumbosacral strain syndrome, and unexplained weight loss. R. 284. Dr. Ortolani ordered a cervical and lumbar magnetic resonance imaging ("MRI"), and prescribed Lortab and physical therapy. R. 284.

On January 2, 2008, the MRI's revealed a "central annular tear versus herniated disc C6-7 level," "straightening of the cervical spine, consistent with muscle spasms," a "moderate sized herniated disc L3-L4 level to the left, narrowing the intervertebral foramen," and a "small herniated disc L2-L3 level to the left." R. 286-87. On January 24, 2008, Dr. Ortolani's notes reflect that Claimant experienced "significant injuries," but was "doing reasonably well" with a moderate amount of pain and discomfort, and severe headaches. R. 282. Dr. Ortolani added Topamax and Desyrel to Claimant's medication regimen. R. 282.

---

[3] During the above-referenced time period, Dr. Hull continued to prescribe the same types of medications previously prescribed, but his records indicate that Claimant was "double dipping" on pain medications with other doctors and Dr. Hull had Claimant sign a contract not to get pain medication from any other doctor. R. 405. On October 9, 2009, Claimant presented to the emergency room at Halifax Health Systems experiencing withdrawal symptoms. R. 415. Claimant stated that she was trying to detox herself from Xanax, Restoril, Soma, and Lortab. R. 415.

On February 19, 2008, Dr. Ortolani's records show that Claimant is having "increased headaches," and an "occipital neuralgia that really needs to be treated." R. 281. Dr. Ortolani described Claimant's headaches as "out of control." R. 281. With respect to her cervical and lumbar injuries, on February 25, 2008, Dr. Ortolani stated that Claimant "is going to have a considerable amount of pain for a long time." R. 280. On that date, Dr. Ortolani noted that Depakote "is getting the headaches under control." R. 280.

On April 1, 2008, Dr. Ortolani stated that due to her lumbar and cervical injuries the Claimant has a 14% total body impairment. R. 279. Dr. Ortolani discontinued physical therapy, but continued Claimant on Lortab and Depakote, and showed Claimant exercises and stretches to do. R. 279. On April 17, 2008, Claimant returned in a "moderate amount of pain and discomfort." R. 278. Dr. Ortolani's notes reflect that "[t]he therapy and medication really have not given her much in the way of relief." R. 278. Dr. Ortolani increased Claimant's medications and ordered epidural steroid injections. R. 278. On May 19, 2008, Claimant's pain and discomfort were the same and Dr. Ortolani reviewed the exercises and stretches Claimant needed to perform and also recommended that she do some swimming. R. 345. On June 30, 2008, Claimant was still experiencing muscle spasms in the neck, but Claimant seemed more stable. R. 344. Dr. Ortolani provided a trigger point injection of Lidocaine into the cervical area. R. 344.

Claimant's condition remained unchanged until August 28, 2008, when Dr. Ortolani's records reflect that Claimant "is doing worse." R. 342-43. Claimant displayed "pain in all her joints, including her neck, hands, knees, and ankles." R. 342. Dr. Ortolani provided another trigger point injection, added Parafon Forte and Mobic. R. 342. On September 22, 2008, Dr. Ortolani's notes show that Claimant continued to experience pain and discomfort, but he stated that the position in which she sleeps is prolonging the pain. R. 379. On November 20, 2008,

Claimant presented in much the same condition and requested another trigger point injection.  R. 378.  Dr. Ortolani declined to do the injection stating that her medications seem to be stabilizing her pain to some degree, and he added Robaxin to her medical regimen.  R. 378.

On November 25, 2008, Dr. Ortolani provided answers to a questionnaire regarding Claimant's functional limitations.  R. 373.  Dr. Ortolani opined that Claimant, on an numerical scale of 1 to 5 is limited to walking 2/5 and sitting 3/5, stating that Claimant cannot walk or sit for any length of time.  R. 373.  Claimant's left grip strength was 2/5 and her right grip strength was normal.  R. 373.  Dr. Ortolani opined that Claimant's "neck is very painful [and she] can not sit for any length of time."  R. 373.  With respect to Claimant's gait and station, Dr. Ortolani opined that Claimant "has to take very small steps, has to rest, [and is] very unsteady on feet."  R. 373.  Dr. Ortolani opined that Claimant cannot squat, walk on toes or heals, but does not require an assistive device for ambulation.  R. 373.

On January 20, 2009, Dr. Ortolani's notes state:

> The patient is doing about the same at this time.  She continues to have a moderate amount of pain and difficulty.  She is getting most of her medicines at this time from Dr. James Hull.  He has her on pain medication and muscle relaxant.  At this time I do not feel there is much more I have to offer. . . .  We are working with Pfizer to get her a discount on [medications], as she cannot afford this otherwise.

R. 377.  On April 2, 2009, Claimant presented with "increasing pain in the cervical region."  R. 376.  Dr. Ortolani provided a trigger point injection in the cervical region, provided Claimant with a cervical collar because "she is constantly using the arm, straining, and causing difficulties."  R. 376.  Dr. Ortolani told Claimant "to stop reaching with the left arm, the bending of her neck, and the things that are hurting her."  R. 376.  On April 20, 2009, Claimant presented in a moderate amount of pain and difficulty, but improved following the trigger point injection.

R. 375.   Dr. Ortolani stated that Claimant "has greater range of motion in the neck regions, with less spasms." R. 375.  The record contains no further treatment records from Dr. Ortolani.

### F.  Dr. Ramin Bonnet – March 20, 2007 – April 1, 2010.

The record contains thirteen (13) treatment records from Dr. Bonnet and two opinions regarding Claimant's limitations.   R. 243, 383-99, 412, 426-37.  On March 20, 2007, Dr. Bonnet's records reflect that Claimant has chronic fibromyalgia, pain, anxiety, and panic disorder. R. 243.  Physical examination revealed no neurological, motor, or sensory deficits.  R. 243.  Musculoskeletal exam also showed no joint pains and no evidence of muscle spasms.  R. 243.

Claimant was not treated by Dr. Bonnet again until February 20, 2009.  R. 398.  On that date, Claimant presented for a medication refill and Dr. Bonnet's notes state that a prior mammogram showed a density, but Claimant declined to do an ultrasound or a CT scan because she cannot afford it.  R. 398.  Dr. Bonnet stated that "[t]his is a difficult patient to deal with. . . . If she wants to choose what she wants to do and what she doesn't want to do, I told her as her doctor I will continue with her present care but the point is that if she gets cancer or has any medical problems she knows it is because she is refusing the tests and she accepts the risks."  R. 398.  On March 20, 2009, Dr. Bonnet's notes reflect that Claimant was taking Lortab, Xanax, Soma, Ambien, Esgic Plus, Maxalt, Lamotil, Prozac, and Cipro.  R. 397.  On April 20, 2009, Dr. Bonnet diagnosed Claimant with lumbalgia, lumbar radiculopathy, muscle spasms, polyarthralgias and anxiety.  R. 394.  Dr. Bonnet stated that Claimant is not a surgical candidate "but she has chronic neck pain." R. 394.

On July 14, 2009, Dr. Bonnet completed a Medical Verification Form.  R. 412.  Dr. Bonnet stated that Claimant suffers from herniated discs in the cervical and lumbar spine,

fibromyalgia, migraines, and depression.  R. 412.  Dr. Bonnet opined that Claimant cannot work

sitting down or standing up, and Claimant is unable to work at all.  R. 412.  Dr. Bonnet

concluded that the conditions are permanent, Claimant is required to attend physical therapy

three times per week, and is seen for treatment once a month.  R. 412.  On that same day, Dr.

Bonnet injected Claimant with Decardron.  R. 392.

On August 11, 2009, Dr. Bonnet's notes provide that Claimant "has been feeling more

down and is a little more upset right now.  She has no suicidal ideation but is crying more."  R.

390.  Claimant's diagnoses remained lumbalgia, muscle spasms, and anxiety, but physical exam

revealed "no evidence of muscle spasms."  R. 390.  From August 2009 through January 7, 2010,

Claimant continued to present to Dr. Bonnet for medication refills.  R. 383-88.  On February 4,

2010, Dr. Bonnet diagnosed Claimant with lumbalgia, polyarthralgias, muscle spasms, joint pain,

anxiety, fibromyalgia, and a basal cell on her face.  R. 436.  Physical examination showed no

evidence of muscle spasms or joint pain, and lumbar, cervical, thoracic, and lower extremities

were within normal limits.  R. 436.  On April 1, 2010, Dr. Bonnet's notes state that Claimant has

been treated for chronic pain for fifteen (15) years, continues to carry the same diagnoses, and

her medications "keep[ ] her functional."  R. 431.  There are no other treatment records from Dr.

Bonnet.

On April 15, 2010, Dr. Bonnet provided a physical RFC opinion.  R. 426-30.  Dr. Bonnet

opined that Claimant suffers from lumbar and cervical radiculopathy, and receives treatment

once per month.  R. 426.  Dr. Bonnet concluded that Claimant's prognosis is "not good."  R. 426.

Dr. Bonnet stated that the pain radiates into her leg and arm and there is numbness in Claimant's

right thigh.  R. 426.  Dr. Bonnet opined that the pain is constant and increases in intensity with

prolonged sitting and standing.  R. 426.  Dr. Bonnet stated that the clinical and objective signs of

these limitations are the MRI and neurological evaluation.  R. 426.  Dr. Bonnet indicated that time and pain medications have decreased her pain and increased her daily activities.  R. 426.

Dr. Bonnet opined that Claimant is not a malingerer and her impairments are expected to last at least twelve months.  R. 427.  Dr. Bonnet stated that emotional factors, including depression, anxiety, and a personality disorder contribute to the severity of Claimant's symptoms and functional limitations.  R. 427. Dr. Bonnet concluded that Claimant's pain will frequently be severe enough to interfere with her ability maintain the attention and concentration needed to perform simple tasks.  R. 427.  Dr. Bonnet opined that Claimant is incapable of even low stress jobs due to severe radiculopathy, fatigue, and chronic migraines.  R. 427.

Dr. Bonnet stated that Claimant is capable of walking 1 to 2 city blocks without rest or experiencing severe pain.  R. 427.  Dr. Bonnet opined that Claimant can sit for up to 30 minutes without having to get up and can stand 10 minutes at one time before having to sit down.  R. 427-28.  Dr. Bonnet stated that Claimant must walk around every twenty minutes and must walk for 10 minutes each time.  R. 428.  Dr. Bonnet concluded that Claimant can sit, stand, and walk for less than two hours in an 8 hour workday.  R. 428.

Dr. Bonnet stated that Claimant would require a job that permitted shifting positions at will from sitting, standing, or walking, will need unscheduled breaks every 30 minutes and will need to rest every 2 hours.  R. 428.  Dr. Bonnet opined that Claimant can rarely lift less than 10 pounds, rarely look up or hold her head in a static position, occasionally look down and turn her head to the right or left, never twist, climb ladders, and stairs, and rarely stoop.  R. 429.  Dr. Bonnet concluded that Claimant will be absent from work due to her impairments more than four days per month.  R. 430.

### G.  Dr. Jeff Oatley – July 17, 2008.

On July 17, 2008, Dr. Jeff Oatley, a psychologist, conducted a consultative psychological examination of Claimant.  R. 305-07.  The only medical records reviewed by Dr. Oatley appear to be Dr. Ortolani's January 2008 diagnosis of a moderately sized herniated disc at the L3-L4.[4] R. 305.  Claimant reported that she had received no inpatient or outpatient psychiatric counseling and that Dr. Hull is prescribing Effexor, which has not been successful.  R. 305. Claimant did not bring a list of her medications to the evaluation.  R. 306.

Dr. Oatley's mental status evaluation revealed sad mood, low self-esteem, normal energy, adequate fund of knowledge, coherent speech, no concentration deficits, no orientation problems, no severe memory deficits, no paranoia, appropriate attention span, and a good grip with the right hand.  R. 306-07.  Dr. Oatley diagnosed Claimant with: herniated disc in the lumbar spine, rule out cervical herniated discs, rule out fibromyalgia, pain disorder associated with spinal pain and depression that exacerbates the perception of pain, and major depressive disorder, single episode as indicated by sadness, low self-esteem, sleep difficulties, feeling helpless, lack of enjoyment, and suicidal ideation.  R. 307.  Dr. Oatley opined that Claimant's prognosis is guarded due to lack of mental health care.  R. 307.  With respect to daily functioning, Dr. Oatley stated that Claimant: stays home all day in bed watching television; can do only light household chores; is self-sufficient in bathing and dressing; has friends, but no enjoyable activities; and, in the area of concentration and task persistence, has difficultly completing routine household chores due to pain.  R. 307.

---

[4] It does not appear that Dr. Oatley had the benefit of any medical records other that Dr. Ortolani's January 2008 diagnosis of a herniated disc at the L3-L4.

### H.  Dr. Alvan Barber – July 23, 2008.

On July 23, 2008, Dr. Alvan Barber conducted a consultative physical examination of Claimant.  R. 309-17.  Claimant reported that she suffers from fibromyalgia, back injury, and depression.  R. 309.   Claimant stated that she can walk for five minutes, stand for five minutes and sit for twenty minutes.  R. 309.  Dr. Barber indicates that Claimant was taking Percocet, Espic plus, Maxalt, Ambien, Lomotil, Phenegran, Soma, Xanax, Lortab, Effexor, and Depacote.  R. 310.  Physical examination of Claimant revealed: able to get on and off and lie flat on the examination table; positive para-cervical spasms with pain; numbness and tingling in the right forearm and hand; 5/5 muscle strength in right and left upper extremities and in the right and left hands; left elbow pain with range of motion; 5/5 muscle strength in lower extremities; negative straight leg raises while seated; positive straight leg raises while supine with low back pain; positive point tenderness in the right and left SI joint; positive paravertebral muscle spasms; fine and gross motor skills intact; positive 6/18 trigger points; able to walk without difficulty; and unable to walk on toes, heels, and unable to squat. R. 311-13.   Mental status examination revealed no evidence of depression.

Dr. Barber's impressions were: history of fibromyalgia; lumbar disorder with low back pain; depression on medication; headache disorder, migraines, improved with medication; and anxiety disorder, on medication.  R. 312.   Dr. Barber opined that Claimant: would be limited in walking for long periods of time; could be capable of standing and sitting for reasonable periods of time; and could be capable of using upper body movements and coordinated activities with hands.  R. 312.

### I.   Howard Kiker – July 29, 2008.

On July 29, Howard Kiker provided a non-examining RFC assessment based upon a records review.  R. 319-26.[5]  Mr. Kiker opined that Claimant has a primary diagnosis of a history of fibromyalgia, a secondary diagnosis of lumbar degenerative disc disease with low back pain, and other alleged impairments of headaches, which are controlled on medications.  R. 319.  Dr. Kiker opined that Claimant can: lift 20 pounds occasionally, 10 pounds frequently; stand or walk about 6 hours in an 8-hours workday; sit for 6 hours in an 8-hour workday; and is unlimited in her ability to push or pull.  R. 320. Mr. Kiker based his opinion on Dr. Barber's consultative examination and Claimant's history of an abdominal hernia repair and thumb problems.  R. 320.

Mr. Kiker opined that Claimant can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs.  R. 321.   Claimant can never crouch, but can occasionally balance, stoop, kneel, and crawl.  R. 321.  Mr. Kiker opined that Claimant has no manipulative, visual, or communicative limitations.  R. 322-23.  Claimant must avoid concentrated exposure to extreme cold, noise, vibration, fumes, odors, dusts, gases, and poor ventilation.  R. 323.  Mr. Kiker stated that the record he reviewed does not contain any treating source opinion.  R. 325.

### J.   Dr. James Levasseur – July 29, 2008.

On July 29, 2008, Dr. James Levasseur, a psychologist, provided a non-examining psychiatric review technique ("PRT") based upon a medical records review.  R. 327-40.  Dr. Levasseur opined that Claimant's mental impairments are not severe impairments.  R. 327.  Dr. Levasseur found that Claimant suffers from major depressive disorder and pain disorder, and these impairments result in only mild functional limitations.  R. 330, 333, 337.   Dr. Levasseur

---

[5] The RFC provided by Mr. Kiker does not indicate his qualifications, but neither party has challenged Mr. Kiker's qualifications.

noted that Claimant's treatment records show a history of anxiety and depression, but based on Dr. Oatley's consultative examination, Dr. Levasseur concluded that Claimant's pain disorder and major depressive disorder do not suggest a severe mental illness.  R. 339.

### K.  Dr. Angeles Alvarez-Mullin – September 26, 2008.

On September 26, 2008, Dr. Angeles Alvarez-Mullin, a medical doctor, provided a PRT based upon a medical records review.  R. 350-63.  Dr. Alvarez-Mullin opined that Claimant's mental impairments are not severe impairments.  R. 350.  Dr. Alvarez-Mullin found that Claimant suffers from a major depressive disorder, single episode, which results in only mild functional limitations    R. 353, 360.  Dr. Alvarez-Mullin noted that Dr. Hull had diagnosed Claimant with severe anxiety and depression, and he prescribed Effexor and Xanax.  R. 362.  Dr. Alvarez-Mullin based his opinion on Dr. Oatley's consultative examination, Claimant's ability to take care of her personal hygiene, prepare simple meals, do light cleaning and laundry when physically able, and drive.  R. 362.  Dr. Alvarez-Mullin also noted that Claimant "indicates limitations are physical."  R. 362.  Dr. Alvarez-Mullin did not find that Claimant suffers from pain disorder.  R. 350-63.

### L.  Dr. Nicholas Bancks – October 16, 2008.

On October 16, 2008, Dr. Nicholas Bancks provided a non-examining physical RFC assessment based upon a medical records review.  R. 364-71.  Dr. Bancks found that Claimant has the primary diagnoses of cervical and lumbar herniated discs and cluster headaches with no secondary diagnoses.  R. 364.  Dr. Bancks opined that Claimant can perform the full exertional range of light work based on his finding that the medical record showed that Claimant's pain is not truly worsening, but waxes and wanes.  R. 365-366.  Dr. Bancks opined that Claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl, and has no manipulative, visual, or

communicative limitations.   R. 366-68.   Dr. Bancks found that Claimant should avoid concentrated exposure to hazards, but otherwise has no environmental limitations.  R. 368.  Dr. Bancks opined that Claimant's complaints of pain are partially credible, but there has been no worsening of pain symptoms, Dr. Barber's examination revealed good functional ability and, therefore, Claimant's allegations exceed the objective medical record.  R. 369.  Dr. Bancks did not review any treating source opinion.  R. 370.

III.    **ADMINISTRATIVE PROCEEDINGS.**

Claimant's application was denied initially and upon reconsideration.  R. 53-60.   In an April 20, 2008 pain questionnaire, Claimant stated that her pain makes it hard to walk, sleep, reach, and lay down.  R. 130.  Claimant said her medications allow her to get through the day, but the pain still exists in her shoulder, arm, neck, back and left leg.  R. 130.  Claimant stated that migraines also prevent her from completing her chores.  R. 130-31.  Claimant reported that physical therapy has not provided any relief from her pain.  R. 132.  Claimant said she is able to: cook sometimes; take care of her personal hygiene, but has to hold on to a railing in the shower; do the laundry; grocery shop; sleep with difficulty; and drive with difficulty.  R. 132.   On May 5, 2008, Claimant completed a function report, stating that her husband does the cooking, grocery shopping, and errands, and her daughter does the housecleaning.  R. 150.  Claimant reported that she has difficulty dressing, shaving, and showering, and due to these limitations she stays in bed approximately 6 hours per day.  R. 150.

Claimant requested a hearing before an ALJ and, on April 30, 2010, a hearing was held before ALJ Gerald F. Murray.  R. 22-44.  Claimant and vocational expert Donna Mancini (the "VE") were the only persons to testify at the hearing.  R. 22.  Claimant testified that her greatest impairments were her neck and back problems, but she also suffers from problems with

concentration, migraines, which present with severe symptoms approximately 4 times per month, fibromyalgia, irritable bowel syndrome, depression, muscle spasms and pain. R. 29-37. Claimant testified that she is never pain free. R. 30, 33. Claimant stated that she does not have health insurance and she cannot afford certain treatments. R. 36. Claimant also reported experiencing side-effects from her medications, including drowsiness and blurred vision. R. 37-38. Claimant testified that she can walk for five minutes before having to stop due to pain radiating from her hip to her left leg. R. 38-39. Claimant stated she can stand for 15 minutes without having to change positions or sit down. R. 39. Claimant testified that she can lift ten pounds with her right hand, but not with her left hand due to her problems with the left thumb. R. 39. Claimant said she can sit for 15 minutes at a time. R. 40.

The VE testified that Claimant's prior work as a housekeeper was light, unskilled work, her work as a dental receptionist was sedentary, semi-skilled work, her work as a retail manager was light, skilled work, and her work as an office manager was light, semi-skilled work. R. 25. The ALJ did not pose a hypothetical question to the VE. R. 22-44.

On May 19, 2010, the ALJ issued a decision finding that the Claimant has not been disabled from January 21, 2007 through the date of the decision. R. 14-21. At step-two, the ALJ determined, without elaboration, that Claimant has the following severe impairments: back pain; neck pain; headaches; fibromyalgia; and polyarthralgia. R. 16. The ALJ also determined that Claimant's mental impairment of depression is a not a severe impairment because it does not cause "more than minimal limitation in the [C]laimant's ability to perform basic mental work activities." R. 16. With respect to Claimant's depression, the ALJ stated:

> The first functional area is activities of daily living. In this area, the [C]laimant has mild limitation as she cares for her personal hygiene, prepares simple meals, does light cleaning and laundry. The next functional area is social functioning. In this area, the

> [C]laimant has mild limitation as she spends time with family and
> has friends and socializes on the telephone.  The third functional
> area is concentration, persistence or pace.  In this area, the claimant
> has mild limitations as she is able to drive a motor vehicle, spends
> time watching television, and is noted to be able to manage her
> finances. . . . These findings are consistent with those made by the
> State agency evaluators.

R. 17.  The ALJ does not cite to which "State agency evaluators" he is referencing.  R. 17.  The

ALJ does not mention Dr. Oatley's evaluation, nor does the ALJ mention Dr. Hull's treatment

records or his repeated diagnoses of severe depression, anxiety or panic disorder.  R. 14-21.

After determining that Claimant's impairments do not meet or medically equal a listing,

the ALJ determined that Claimant retains the RFC for a "full range of light work."  R. 17.  In

making this finding, the ALJ discussed Claimant's testimony at the hearing, portions of the

medical record, and the opinion evidence.  R. 18-20.  With respect to Claimant's testimony, the

ALJ stated:

> The [C]laimant alleges disability for pain and limitations caused by
> her medically documented impairments.  At the due process
> hearing, the [c]laimant testified she suffers four migraines a month
> and has herniated discs in her neck and back that cause pain that
> radiates into her left foot.  She stated she is never pain free and has
> not undergone any surgery.  The [C]laimant has received no
> inpatient or outpatient care from a mental health specialist.

R. 19.  The ALJ then made a credibility determination, stating:

> After careful consideration of the evidence, the [ALJ] finds that the
> [C]laimant's medically determinable impairments could
> reasonably be expected to cause the alleged symptoms; however,
> the [C]laimant's statements concerning the intensity, persistence
> and limiting effects of these symptoms are not credible to the
> extent they are inconsistent with the above [RFC].
>
> The [C]laimant partakes in a wide array of activities which are not
> limited to the extent one would expect given the complaints of
> disabling symptoms and limitations.  She admitted certain abilities
> which provide support for part of the [RFC] conclusion in this
> decision.  The record also reveals that care has been generally
> conservative and not the type of treatment one would expect for a

> totally disabled individual.  Such conservative care has been relatively successful in controlling the [C]laimant's symptoms.
>
> The record reveals the [C]laimant has experienced migraines for years prior to her alleged disability onset date.  The fact that they did not prevent her from working at that time strongly suggests that they would not prevent work now.
>
> Treatment notes indicate that many of the [C]laimant's symptoms including mood swings and hot flashes may actually be related to menopause rather than caused by the alleged disabling impairments.  The record also reveals the [C]laimant has been noncompliant in obtaining recommended medical testing despite the doctor's warning of cancer.

R. 19-20.  Thus, to the extent Claimant alleges symptoms which would limit her to less than the full range of light work, the ALJ determined that Claimant's subjective statements are not credible.  The ALJ based that finding on: 1) Claimant partaking in an unspecified, but wide array of activities; 2) Claimant has received only conservative treatment, which has been successful, and is not the type of treatment the ALJ would expect from someone who is disabled; 3) Claimant had migraines before the alleged onset date and continued to work; 4) the notion that her symptoms may actually be related to menopause; and 5) Claimant has not been compliant with recommended ultrasounds and CT scans after a density was discovered on a mammogram.  R. 19-20.

With respect to the medical evidence, the ALJ discusses early X-rays showing minimal osteoarthritic changes and mild degenerative changes, as well as a brief description of Dr. Tessler's treatment records.  R. 18.  The ALJ then discusses Dr. Ortolani's treatment records and opinion as follows:

> The record indicates that the [C]laimant was involved in a slip and fall accident in a parking lot on December 15, 2007.  John A. Ortolani, M.D., noted on January 24, 2008 that the [C]laimant was doing reasonably well and had herniated discs in her neck and low back.  Dr. Ortolani prescribed medication which improved the [C]laimant's headaches.  The January 2, 2008 MRI's revealed a

> moderate sized herniated disc at L3-L4 narrowing the intervertebral foramin, a small herniation at L2-3, central annular tear at C6-7, and straightening of the cervical spine consistent with muscle spasm.  Dr. Ortolani referred the [C]laimant for injections. . . . Recent office notes dated April 20, 2009 state the [C]laimant is improved following trigger point injection.  Dr. Ortolani noted the [C]laimant constantly uses and strains her arm which impedes her ability to get better. . . .

> On November 25, 2008, Dr. Ortolani completed a form and noted the [C]laimant cannot walk for any length of time and cannot sit for any length of time.  Her left hand grip measured 2/5 and right hand measured 5/5.  He stated she is very unsteady on her feet yet does not require any assistive device.

R. 18-19.   Thus, the ALJ discusses the MRI's, portions of two of Dr. Ortolani's treatment records, and Dr. Ortolani's opinion.  R. 18-19.

The ALJ states the following about Dr. Bonnet's records:

> The [C]laimant receives care from Ramin D. Bonnet, D.O.  At the February 20, 2009 office visit, Dr. Bonnet noted that the [C]laimant is difficult to deal with and by refusing recommended testing she may be at risk for developing cancer.  On February 9, 2010 the [C]laimant's representative submitted a check off type form completed by Dr. Bonnet on July 14, 2009 noting that her back condition, fibromyalgia, migraines, and depression, result in the inability to work sitting down or while standing.  On April 1, 2010, Dr. Bonnet noted that the [C]laimant's medication keeps her functional.  On April 15, 2010, Dr. Bonnet completed a form at the request of the [C]laimant's representative and opined that she can walk one to two blocks and sit for 30 minutes at a time and stand for 10 minutes at a time.  The [C]laimant does not require any assistive device for standing or walking.

R. 19.  Thus, the ALJ discusses two portions of Dr. Bonnet's treatment records, his July 14, 2009 opinion, and the portion of Dr. Bonnet's April 15, 2010 opinion addressing Claimant's ability to stand and walk.  R. 19.  *See also* R. 426-30.

With respect to the opinion evidence, the ALJ states:

> Little weight is given to the opinions in forms completed by Dr. Ortolani and Dr. Bonnet.  Though completed by treating sources, the opinions are quite conclusory and provide little explanation of

the evidence relied on in forming the opinions. The doctors apparently relied quite heavily on the subjective report of symptoms and limitations provided by the [C]laimant and seemed to uncritically accept as true most, if not all, of what the [C]laimant reported. Dr. Ortolani's limitations have the [C]laimant practically bedridden which is certainly not the case. Furthermore, these opinions are not supported by the doctors' own treatment notes or by the record on the whole rendering them less persuasive. The remaining treating source opinions deserve great weight as they are well supported and consistent with one another and with record on the whole.

The opinions of the consultative examiners are given great weight. These sources examined the [C]laimant and issued unbiased opinions consistent with the record on the whole.

Great weight is given to the opinions of the State agency evaluators. These specially trained sources reviewed records and issued unbiased opinions consistent with the one another and with the record on the whole.

In sum, the above [RFC] is supported by the hearing testimony and evidence record on the whole.

R. 20. Thus, the ALJ gave little weight to the opinions of Drs. Ortolani and Bonnet. R. 20. With respect to Dr. Ortolani, the ALJ stated that his opinion would have the Claimant completely bedridden. R. 20. As to all three opinions, the ALJ stated that they deserve little weight because they: 1) are conclusory; 2) apparently relied heavily and uncritically on the Claimant's subjective statements; and 3) are not supported by their respective treatment records and the record on the whole. R. 20. The ALJ gave great weight to the remaining treating source opinions, but it is unclear whose opinions or records the ALJ is referring to. R. 20. The ALJ gave great weight to the consultative examining and non-examining opinions because they are: 1) unbiased; 2) consistent with the record on the whole; 3) and consistent with one another. R. 20. Finally, the ALJ concludes that the RFC for a full range of light work is supported by the hearing testimony and the evidence of record on the whole. R. 20. Accordingly, based upon Claimant's RFC for a full range of light work, because Claimant's prior work was light or sedentary work, the ALJ

determined that she could perform her past relevant work and, therefore, is not disabled.  R. 20-21.

On December 7, 2011, the Appeals Council denied Claimant's request for review.  R. 1.

On January 5, 2012, Claimant appealed the final decision of the Commissioner in the District

Court. Doc. No. 1.

## IV.   LEGAL STANDARDS.

### A.  THE ALJ'S FIVE-STEP DISABILITY ANALYSIS.

Under the authority of the Social Security Act, the Social Security Administration has

established a five-step sequential evaluation process for determining whether an individual is

disabled. See 20 CFR §§ 404.1520(a), 416.920(a).  In Doughty v. Apfel, 245 F.3d 1274, 1278

(11th Cir. 2001), the Eleventh Circuit explained the five-step sequential evaluation process as

follows:

> In order to receive disability benefits, the claimant must prove at step one that he is not undertaking substantial gainful activity. At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments. At step three, if the claimant proves that his impairment meets one of the listed impairments found in Appendix 1, he will be considered disabled without consideration of age, education, and work experience. If the claimant cannot prove the existence of a listed impairment, he must prove at step four that his impairment prevents him from performing his past relevant work. At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides his past relevant work.

Id. (citations omitted). The steps are followed in order.  If it is determined that the claimant is not

disabled at a step of the evaluation process, the evaluation will not go on to the next step.

### B.  THE STANDARD OF REVIEW.

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991)).

Where the Commissioner's decision is supported by substantial evidence, the District Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The District Court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). The District Court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004).

### C.  REMEDIES.

Congress has empowered the District Court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  To remand under sentence

four, the District Court must either find that the Commissioner's decision applied the incorrect law, fails to provide the court with sufficient reasoning to determine whether the proper law was applied, or is not supported by substantial evidence. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (reversal and remand appropriate where ALJ failed to apply correct law or the ALJ failed to provide sufficient reasoning to determine where proper legal analysis was conducted) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)); *Jackson v. Chater*, 99 F.3d 1086, 1090-91 (11th Cir. 1996) (remand appropriate where ALJ failed to develop a full and fair record of claimant's RFC); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for District Court to find claimant disabled).

This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Bowen v. Heckler*, 748 F.2d 629, 631, 636-37 (11th Cir. 1984). A claimant may also be entitled to an immediate award of benefits where the claimant has suffered an injustice. *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982). The District Court may remand a case to the Commissioner for a rehearing under sentences four or six of 42 U.S.C. § 405(g); or under both sentences. *Jackson*, 99 F.3d at 1089-92, 1095, 1098. Where the District Court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 827, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not

significantly affect her ability to work).[6]

## V.    ANALYSIS.

### A.  Opinion Evidence.

The Claimant raises four related arguments with respect to the opinion evidence.  Doc. No. 19 at 18-21.  First, Claimant maintains that the ALJ lacked good cause to reject the opinions of Drs. Ortolani and Bonnet.  Doc. No. 19-20.  Second, Claimant maintains that the ALJ failed to state with particularity the weight given to the opinions of Drs. Hull, Tessler, and Gillespy.  Doc. No. 19 at 18.  Third, Claimant argues that while that ALJ apparently gave great weight to Dr. Barber's opinion, he erred because Dr. Barber's opinion conflicts with the ALJ's RFC assessment.  Doc. No. 19 at 18-19.  Fourth, the Claimant contends that the ALJ's decision to give great weight to the opinions of the non-examining physicians is not supported by substantial evidence.  Doc. No. 19 at 20-21.   The Commissioner argues that the ALJ applied the correct legal standards to the opinion evidence and his findings are supported by substantial evidence.  Doc. No. 21 at 18-23.

Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of steps four and five of the ALJ's sequential evaluation process for determining disability.   The Eleventh Circuit recently clarified the standard the Commissioner is required to utilize when considering medical opinion evidence.  In *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1178-79 (11th Cir. 2011), the Eleventh Circuit held that whenever a physician offers a statement reflecting judgments about the nature and severity of a

---

[6] On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand ALJ required to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (on remand ALJ required to consider the need for orthopedic evaluation).  After a sentence-four remand, the District Court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can still do despite his or her impairments, and the claimant's physical and mental restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given to it and the reasons therefor. *Id.* (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)).  The Eleventh Circuit stated that "'[i]n the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.'" *Winschel*, 631 F.3d at 1178-79 (quoting *Cowart v. Schwieker*, 662 F.2d 731, 735 (11th Cir. 1981) (emphasis added)). *See also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (failure to state with particularity the weight given to opinions and the reasons therefor constitutes reversible error); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (failure to clearly articulate reasons for giving less weight to the opinion of treating physician constitutes reversible error).

In *Winschel*, the Commissioner argued that the ALJ did not err by failing to state the weight he gave to a treating physician's treatment notes and the reasons therefor because they did not constitute an "opinion." 631 F.3d at 1178-79.  The Eleventh Circuit disagreed because the treatment notes contained "a description of Winschel's symptoms, a diagnosis, and a judgment about the severity of his impairments, and clearly constituted a 'statement[] from [a] physician . . . that reflect[s] judgments about the nature and severity of [Winschel's] impairment(s), including [Winschel's] symptoms, diagnosis and prognosis, what [Winschel] can still do despite impairment(s), and [Winschel's] physical or mental restrictions.'" *Id.* (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).  Thus, the treating physician's treatment notes constituted an opinion. *Id.*  The Eleventh Circuit noted that the ALJ only referenced the treating physician once and did not state the weight given to the treating physician's opinion. *Id.*  The

Eleventh Circuit reversed stating that "[i]t is possible that the ALJ considered and rejected these .

. . medical opinions, but without clearly articulated grounds for such a rejection, we cannot

determine whether the ALJ's conclusions were rational and supported by substantial evidence."

*Id.*

Absent good cause, the opinions of treating physicians must be accorded substantial or

considerable weight. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).

> Good cause exists when the: "(1) treating physician's opinion was
> not bolstered by the evidence; (2) evidence supported a contrary
> finding; or (3) treating physician's opinion was conclusory or
> inconsistent with the doctor's own medical records." *Phillips v.
> Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir.2004) (citations
> omitted); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th
> Cir.1991); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th
> Cir.1986).

*Johnson v. Barnhart*, 138 F. App'x. 266, 269 (11th Cir. 2005).[7]  "The opinion of a non-

examining physician does not establish the good cause necessary to reject the opinion of a

treating physician." *Id.* Moreover, the opinions of a non-examining physician do not constitute

substantial evidence when standing alone. *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090,

1094 (11th Cir. 1985).

The opinions or findings of a non-examining physician are entitled to little weight when

they contradict the opinions or findings of a treating or examining physician. *Lamb v. Bowen*,

847 F.2d at 703. Moreover, conclusory statements by an ALJ to the effect that an opinion is

inconsistent with or not bolstered by the medical record are insufficient to show an ALJ's

decision is supported by substantial evidence unless the ALJ articulates factual support for such a

conclusion. *See Poplardo v. Astrue*, No. 3:06-cv-1101-J-MCR, 2008 WL 68593 at *11 (M.D.

Fla. Jan. 4, 2008) (failure to specifically articulate evidence contrary to treating doctor's opinion

---

[7] In the Eleventh Circuit, unpublished decisions are not binding but are persuasive authority.

requires remand); *see also Paltan v. Comm'r of Social Sec.*, No. 6:07-cv-932-Orl-19DAB, 2008 WL 1848342 at *5 (M.D. Fla. Apr. 22, 2008) ("The ALJ's failure to explain how [the treating doctor's] opinion was 'inconsistent with the medical evidence' renders review impossible and remand is required.").

### 1. Drs. Ortolani and Bonnet.

Although Claimant received treatment from Dr. Ortolani on fourteen (14) separate occasions and from Dr. Bonnet on thirteen (13) separate occasions, the ALJ only provides an extremely brief description of that treatment. R. 18-19, 243, 278-87, 342-46, 375-80, 383-99, 412, 426-37.[8]   The ALJ gave little weight to the three opinions offered by Drs. Ortolani and Bonnet because they are conclusory, apparently relied heavily on Claimant's subjective statements, and they are not supported by their own treatment records and the record as a whole. R. 20.

The ALJ failed to articulate good cause to reject the opinions of Claimant's treating physicians.  As to the ALJ's finding that the opinions are conclusory, Dr. Otrolani's November 2008 opinion is not conclusory because he provides written answers to specific questions regarding the Claimant's ability to perform various functions, which are based upon his long standing treatment of the Claimant. R. 373.  For example, on a scale of 1 to 5, Dr. Ortolani opined that Claimant can walk 2/5 and sit 3/5.  R. 373.  In the ALJ's decision, although he correctly notes that Dr. Ortolani stated that Claimant cannot walk or sit for "any length of time," the ALJ failed to acknowledge that Dr. Ortolani provided a numerical scale ranking Claimant's

---

[8] Specifically, the ALJ discussed only portions of two treatment notes from both Drs. Ortolani and Bonnet.  R. 18-19.  While the Court is aware that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," an ALJ must make it clear to a reviewing court that he has considered all of the evidence relevant to a claimant's medical condition.  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).  In this case, the failure of the ALJ to do more than merely highlight very limited portions of Claimant's treatment records makes it difficult to determine whether the ALJ actually considered all the evidence.

limitations.  R. 20.  In addition, Dr. Ortolani further stated that his opinions regarding Claimant's limitations were based upon her neck pain and unsteady walking ability.  R. 373.  Dr. Bonnet's July 14, 2009 opinion that Claimant cannot work sitting down or standing up is not conclusory because it is supported by Dr. Bonnet's diagnoses, recent office visit, and Claimant's treatment regimen.  R. 412.  Similarly, Dr. Bonnet's April 15, 2010 RFC opinion is not conclusory because it is five pages in length, provides the diagnoses, prognosis, description of symptoms, and clinical evidence supporting the functional limitations.  R. 426-30.  Accordingly, it is recommended that the Court find that substantial evidence does not support the ALJ's decision to give little weight to the opinions at issue on the basis that they are conclusory.

Second, the ALJ states that Drs. Ortolani and Bonnet "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the [C]laimant and seemed to uncritically accept as true most, if not all, of what the [C]laimant reported."  R. 20.  The ALJ fails to articulate any basis or cite to any facts supporting this conclusion.  Accordingly, it is recommended that the Court find that ALJ's decision to give little weight to the opinions on the basis that they relied too heavily on the Claimant's subjective statements is not supported by substantial evidence.

Third, ALJ states that the opinions are not supported by the respective treatment notes of Drs. Ortolani and Bonnet, and are not supported by the record as a whole.  R. 20.  In the decision, the ALJ does not discuss in any meaningful detail the treatment records of Drs. Ortolani and Bonnet and fails to articulate any basis, supported by substantial evidence, as to how the treatment records conflict with their respective opinions. R. 18-20.  Similarly, the ALJ fails to articulate any basis, supported by substantial evidence, for his conclusion that the opinions are not supported by the record as a whole.  Accordingly, it is recommended that the

Court find that the ALJ's decision to give little weight to the opinions at issue on the basis that they are not supported by the doctors' own treatment records and the medical record as a whole is not supported by substantial evidence. *See Poplardo v. Astrue*, No. 3:06-cv-1101-J-MCR, 2008 WL 68593 at *11 (M.D. Fla. Jan. 4, 2008); *Paltan v. Comm'r of Social Sec.*, No. 6:07-cv-932-Orl-19DAB, 2008 WL 1848342 at *5 (M.D. Fla. Apr. 22, 2008).

Based on the forgoing, it is recommended that the Court find that the ALJ lacked good cause to give little weight to the opinions of Drs. Ortolani and Bonnet.  Accordingly, it is also recommended that the Court find that the case should be reversed and remanded.[9]

### 2.   Drs. Hull, Tessler, and Gillespy.

As set forth above, Dr. Hull treated Claimant on twenty-nine (29) occasions from December 30, 2005 and January 28, 2009.  R. 229-42, 244-61, 300, 400-409.  Dr. Hull's treatment records reflect similar findings and diagnoses to those in the record from Drs. Ortolani and Bonnet.  R. 229-42, 244-61.  *See also* ante pp. 6-8. Dr. Hull also diagnosed Claimant with chronic and ongoing pain, severe depression and anxiety.  R. 230, 235, 237, 241, 300, 400, 405, 407. On April 7, 2007, Dr. Hull's treatment records reflect limitations in standing, walking and grip strength.  R. 241.  Nevertheless, in the decision, the ALJ never references Dr. Hull, his diagnoses, treatment records, or his opinion regarding Claimant's limitations.  In addition, Dr. Tessler's treatment notes provide a diagnosis of moderate to severe degenerative arthritis of the first carpometacarpal joint, evidence of sharp pain on physical examination, and the statement that "pulling charts and using her thumb to pick things up especially bothers her."  R. 198-200, 205.  While the ALJ noted that Claimant experiences pain in the theft thumb and is not a candidate for surgery, the ALJ did not discuss Dr. Tessler's statement regarding the pain

---

[9]Although it is recommended that the final decision must be reversed and remanded due to the above-stated errors, because this is a report and recommendation, the undersigned will briefly address the remaining issues.

Claimant experiences when pulling charts and using her left thumb to pick things up.  R. 18. Similarly, Dr. Gillespy treatment record revealed crepitus with range of motion, positive Grind's test, and tenderness over the first metacarpocarpal joint.  R. 206.  However, the ALJ failed to discuss Dr. Gillespy's findings.  Pursuant to *Winschel*, 631 F.3d at 1178-79, it is recommended that the Court find that the treatment records of Drs. Hull, Tessler, and Gillespy constitute opinions.  Accordingly, it is further recommended that the Court find that the case should be reversed and remanded because the ALJ failed to state with particularity the weight given to the opinions at issue and the reasons therefor.[10]

### 3.  Consultative and Non-Examining Opinions.

Because of the numerous errors with respect to weighing the opinions the treating physicians, and the other errors detailed below, on remand all of the medical record will have to be reviewed and properly weighed.  *See* ante n. 6.  Therefore, further evaluation of the ALJ's decision with respect to the opinions of the consultative and non-examining physicians is unnecessary.[11]

---

[10] As set forth above, the record also contains  treatment records from a pain specialist, Dr. Bhalani, who noted that after providing Claimant with four nerve block injections, she experienced no relief in her chronic pain symptoms. R. 214.  *See also* ante pp 4-5.  In the decision, the ALJ states: "The [C]laimant received a series of left lateral cutaneous femoral nerve blocks which provided relief from her back and leg pain."  R. 18.  Although not specifically raised by Claimant, the ALJ's statement directly contradicts Dr. Bhalani's findings that the nerve block injections "did not have any help."  R. 214.  This contradiction between the record and the ALJ's characterization thereof also raises a substantial question regarding the degree to which the ALJ considered the record.

[11] Similar to the manner in which the ALJ discussed the medical records and opinions of Claimant's treating physicians, the ALJ provided only a brief and partial summary of Dr. Barber's findings and opinions.  *See* R. 19. Many of Dr. Barber's findings, such as muscle spasms, pain, numbness, and positive straight leg raises are favorable to Claimant's allegations.  R. 309-17.  However, Dr. Barber also made findings, such as 5/5 muscle strength in upper and lower extremities, intact fine and gross motor skills, and walking without difficulty, which are not favorable to Claimant's allegations.  R. 311-13.  Dr. Barber's ultimate opinion regarding Claimant's functional limitations is also vague.  R. 312.  For example, Dr. Barber opined that Claimant would be limited in walking for long periods of time, could be capable of standing and sitting for reasonable periods of time, and could be capable of using upper body movements and coordinated activities with hands, but he did not explain what is meant by long periods of time or reasonable periods of time and the use of words such as "could be capable" is less than clear.  Nevertheless, the ALJ's decision does not explain how he resolved these aspects of Dr. Barber's opinion, but simply gave it "great weight."  R. 20.

**B.  Claimant's Testimony.**

Claimant alleges that the ALJ's reasons for finding her testimony not credible are not supported by substantial evidence.  Doc. No. 19 at 14-17.  In the Eleventh Circuit, subjective complaints of pain are governed by a three-part "pain standard" that applies when a claimant attempts to establish disability through subjective symptoms.  By this standard, there must be: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged symptom arising from the condition or (3) evidence that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)).[12]  "20 C.F.R. § 404.1529 provides that once such an impairment is established, all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995); 20 C.F.R. § 404.1529.[13]  Thus once the pain standard is

---

[12] "Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusion about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity." Social Security Ruling 88-13.

[13] Social Security Ruling 96-7p provides: "2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

3. Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *Id.*

satisfied, the issue becomes one of credibility.

A claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability. *Foote*, 67 F.3d at 1561. "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *Id.* at 1562. The lack of a sufficiently explicit credibility finding may give grounds for a remand if the credibility is critical to the outcome of the case. *Id.*

In this case, the ALJ determined that Claimant's statements are not credible because Claimant: 1) partakes in a wide array of activities; 2) has received only conservative treatment, which has been successful, and is not the type of treatment the ALJ would expect from someone who is disabled; 3) had migraines before the alleged onset date; 4) has menopause, which may be causing her symptoms; and 5) was not compliant with a recommended ultrasound and CT scan. R. 19-20. The ALJ fails to state with particularity which activities Claimant partakes in that demonstrate she is not as limited as claimed. The ALJ's statement that Claimant's treatment has been successful in relieving her symptoms is not supported by reference to any evidence in the record, and the ALJ's statement regarding his personal, non-medical opinion of Claimant's treatment regimen is an insufficient reason for finding her testimony not credible. While Claimant did have migraines before the alleged onset date and continued to work, the ALJ does not provide any basis or explanation for why that would tend to show Claimant's testimony about the limiting effects of her impairments after the onset date are not credible.[14] Claimant's

---

[14] The Court notes that many claimants develop medical conditions prior to the onset date of disability and continue to work prior to their alleged onset date. Standing alone, the mere fact a claimant had a medical condition and continued to work with that condition prior to their alleged onset date is not a basis to find a claimant lacks credibility.

refusal to undergo an ultrasound and CT scan due to lack of funds after a mammogram revealed a density that warranted further examination is not relevant to the disability claim presented in this case. Finally, the ALJ's statement that Claimant's symptoms may be related to menopause rather than any other medically determinable impairment is simply not supported by any reference to record evidence. Accordingly, it is recommended that the Court find that the ALJ's credibility finding is not supported by substantial evidence and that remand is warranted because a proper credibility finding is crucial to a just outcome in this case.[15]

### C. Remedy.

In the section of Claimant's brief concerning the ALJ's credibility determination, the Claimant requests a reversal for an award of benefits. Doc. No. 19 at 17. However, in the conclusion section of the Claimant's memorandum, she requests only a remand for further proceedings. Doc. No. 19 at 22. The record in this case contains: three opinions from two of Claimant's long-standing treating physicians, Drs. Ortolani and Bonnet, who each opine that Claimant is disabled; treatment records and opinions from three other treating physicians, Drs. Hull, Tessler, and Gillespy, who each offer opinions as to Claimant's impairments and limitations that are consistent with the opinions of Dr. Ortolani and Bonnet; two examining

---

[15] Claimant argues that the ALJ erred in determining Claimant's RFC because at step-two the ALJ found numerous non-exertional severe impairments such as pain and headaches, but failed to incorporate any non-exertional limitations in the RFC. Doc. No. 19 at 10-12. The undersigned is troubled by the ALJ's overall lack of meaningful analysis of the medical evidence and recognizes that on its face an individual with severe non-exertional impairments may likely have non-exertional limitations, which must be reflected in the RFC. However, because it is recommended that the case must be reversed for other reasons detailed above, it is unnecessary for the Court to determine whether the ALJ also erred with respect to the RFC. On remand, the ALJ should carefully articulate the reasons for the RFC assessment. *See* 20 CFR § 404.1508; 20 CFR § 404.1529; 20 CFR § 404.1545; 20 CFR § 404.1569a; SSR 96-3p; SSR 96-4p; SSR 96-8p. Claimant also argues that the ALJ erred at step-two by failing to find Claimant's depression, anxiety, panic disorder, and insomnia to be severe impairments and to incorporate limitations therefrom into the RFC. Doc. No. 19 at 12-13. As long as an ALJ's decision demonstrates consideration of the combined effect of all of a claimant's impairments, and if the ALJ finds a severe impairment at step-two, the ALJ satisfies the requirements of regulations. *See Farrington v. Astrue*, Case No. 3:09-cv-94-J-TEM, 2010 WL 1252684 at *4 (M.D. Fla. Mar. 29, 2010). In this case, the ALJ failed to provide any discussion regarding his consideration of Claimant's anxiety, panic disorder, and insomnia. R. 16-17. While such failure may not be an error independently warranting reversal, because the case must be remanded for the above-stated reasons, on remand the ALJ should demonstrate his consideration of the severity of all of Claimant's alleged mental impairments.

consultative opinions, including an opinion from Dr. Barber that contains findings favorable and unfavorable to the Claimant's allegations as well as a vague opinion regarding Claimant's limitations; and opinions from non-examining physicians that contradict the opinions of the treating physicians. The lack of any substantial evidence directly contradicting the opinions of Claimant's treating physicians presents a basis for Claimant's request for an ward of benefits. However, reversal for an award of benefits is only appropriate either where the Commissioner has already considered the essential evidence and it establishes disability beyond a doubt, or where the Claimant has suffered an injustice. *Davis*, 985 F.2d at 534; *Walden*, 672 F.2d at 840. Given the ALJ's sparse discussion of the medical and opinion evidence, including the absence of any reference to Dr. Hull, it is unclear whether the Commissioner has actually considered the essential evidence. Accordingly, it is recommended that the Court reverse and remand for further proceedings.

## VI.   <u>CONCLUSION</u>.

For the reasons stated above, it is **RECOMMENDED** that Court:

1.    **REVERSE and REMAND** the final decision of the Commissioner for further proceedings;

2.    Direct the Clerk to enter judgment in favor of the Claimant; and

3.    Direct the Clerk directed to close the case.

Failure to file written objections to the proposed findings and recommendations contained in this report within **fourteen (14) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RECOMMENDED** in Orlando, Florida on January 22, 2012.

GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this order to:

Richard A. Culbertson
Suite E
3200 Corrine Dr
Orlando, FL 32803

John F. Rudy, III
Suite 3200
400 N Tampa St
Tampa, FL 33602

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Susan Kelm Story, Branch Chief
Christopher G. Harris, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia 30303-8920

The Honorable Gerald F. Murray
Administrative Law Judge
c/o Office of Disability Adjudication and Review
Desoto Building #400
8880 Freedom Crossing
Jacksonville, FL 32256-1224